FAIRBANKS, MORSE & COMPANY, a corporation, Respondent, v. MERCHANTS & CONSUMERS MARKET HOUSE ASSOCIATION, a corporation, Appellant.

St. Louis Court of Appeals. Argued and Submitted March 6, 1918. Opinion Filed April 2, 1918.

1. EVIDENCE: Knowledge of Principal of Acts of Agent: Architects Receiving Deposits: Case for the Jury. Evidence examined and *held* that there is substantial evidence in the case sufficient to submit to the jury, and to warrant the finding that the promoter and afterwards president of defendant company, had knowledge that architects employed by him and later by the defendant were receiving bids by contractors and requiring a guaranty deposit to be returned if the bid was not accepted.

2. ――――: Depositions: Admissibility of Evidence: Fixing Date of Incident. The objection to a question and answer in a deposition that the time of a stated conversation between witness and defendant company's president was not fixed, was properly overruled, where the subsequent portion of the deposition fixed the time.

3. ――――: Harmless Error: Depositions: Conclusions. The conclusion expressed by a witness in his deposition that he knew that defendant company's president knew of the exaction of guaranty checks from bidders was harmless, where the witness fully stated the facts on which the conclusion was predicated.

4. CORPORATIONS: Principal and Agent: Agency: Acts of Promoters: Corporate Liability. A corporation, formed August 6, 1914, and electing a promoter president August 25th, thereafter, who

owned practically all of the stock, which promoter being under contract with another promoter and member of a firm of architects authorized to receive bids for the construction of a corporation building, to transfer a large part of the stock to him and others and put them in charge of the corporation, constitutes such acts as to charge defendant corporation with responsibility for the acts of such promoters, and render it liable for the failure of such firm of architects to return to a bidder a certified check received August 14, 1914, upon rejection of such bid.

5. ———: ———: ———: Evidence: Agency of Architects. Evidence *held* not only sufficient to sustain the charge of the petition that such firm of architects were agents of defendant and to show actual agency, but in point of fact a participation as one of the promoters in the transaction.

6. INSTRUCTIONS: Variance. An instruction *held* not to proceed on the theory of ratification of unauthorized act of architects in receiving bidder's guaranty deposits, thus constituting a departure from the theory of the case defined in the petition.

7. PRINCIPAL AND AGENT: Authority of Agent to Bind Principal: Builders: Agency of Architects. Although in general a builder is not liable for the architect's failure to return guaranty checks on rejection of bids, yet it may be shown that architects were acting for the defendant corporation in such a manner as to bind the corporation.

8. EVIDENCE: Transactions with Others: Admissibility. In an action to recover bidder's deposit held by defendant's architects after rejection of bid, the admission of evidence of another bidder's transactions with these architects, *held* not error.

9. ———: Newspaper Article: Admissibility. In such action, a newspaper article concerning the building to be erected, facts for which were gathered from the architects to whom defendant's promoter referred the reporter for information, *held* properly admitted.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Karl Kimmel*, Judge.

AFFIRMED.

*Charles A. Houts* for appellant.

(1) The petition charged an actual agency existing between defendant and Yoder & Co. . Not only was there no evidence of this, but the evidence completely disproved this allegation. (2) The case was sub-

mitted to the jury on the theory that defendant had ratified the unauthorized acts of Yoder & Co. or was estopped to deny their agency. This was a departure from the theory of the case defined in the petition. Furthermore, ratification or estoppel must be pleaded. Webb v. Allington, 27 Mo. App. 559; Ferneau v. Whitford, 39 Mo. App. 311; McClanahan v. Payne, 86 Mo. App. 284. (3) In the law of agency, there is a clear distinction between an "actual authority" and an "apparent authority" and "ratification" of an assumed authority. St. Louis Gunning Co. v. Wanamaker, 115 Mo. App. 270; Plummer v. Knight, 156 Mo. App. 321. (4) During the beginning of plaintiff's negotiations with Yoder & Co., the defendant was not even in existence. When defendant submitted its bid and delivered its check to Yoder, & Co., defendant, though then incorporated, had not held its first meeting of the board of directors and had no officers. Diesing was merely a director and a stockholder. He had no authority to employ architects, and consequently had no authority to ratify their unauthorized acts or estop the corporation by his knowledge. 10 Cyc. 760, 775, 936, 948; 3 Cook on Corps., secs. 712, 727; Bank v. Bennett, 159 Mo. App. 1. (5) Had Yoder & Co. in fact been architects for defendant (which they were not), that fact alone would not have made defendant liable if they exacted and converted checks from bidders; for an architect is not a general agent, his powers being limited to such as are conferred upon him. 6 Cyc. 29, 30. It was plaintiff's duty to inquire and ascertain what authority Yoder & Co. had to act for this defendant. Hodkinson v. Machinery Co., 161 Mo. App. 94. (6) The testimony of the witness Vogel, representing another bidder, of his transactions with Yoder & Co. was not competent. These transactions were not known to plaintiff, nor to defendant, nor to Diesing. Hence, plaintiff did not rely upon them, nor can

defendant be charged with any responsibility for them. (7) The article published in the St. Louis Republic, in which it was said defendant intended commencing work on the market house therein described, of which C. B. Yoder & Company were said to be the architects, should not have been admitted in evidence. It was "hearsay evidence," and highly prejudicial. Louisiana Purchase Ex. Co. v. Emerson, 149 Mo. App. 594. (8) Newsome, one of plaintiff's witnesses, was permitted to testify that Diesing "knew" Yoder & Company were using the plans and specifications labeled "Merchants & Consumers Market House Association;" that Diesing "knew" that Yoder & Co. were getting in bids; that Diesing "knew" that the bids were accompanied by checks. This testimony was incompetent and highly prejudicial, because, (a) Such "knowledge" was not limited to a time prior to plaintiff's dealing with Yoder & Company. (b) Such testimony is of a mere conclusion, an opinion. It is (in a proper case, under appropriate pleadings) the province of the jury to determine, from facts in evidence, whether a party "knew" a given fact. 3 Chamberlayne, sec. 2344; Sneed v. Gas Co., 149 Cal., 706; Bailey v. State, 107 Ala. 151; Southern Cotton Oil Co. v. Skipper, 125 Ga. 368; Doyle v. Burns, 123 Iowa, 501; Railway Co. v. Martin, 138 Ala. 531; Coal Co. v. Andrews, 150 Ala. 368; Layton v. Campbell, 155 Ala. 220; Pike Co. v. Granger, 162 Ala. 637; Huyck v. Rennie, 151 Calif. 411; Bush v. McCarty Co., 127 Ga. 308; Taylor v. Brown, 49 Ore. 423; Bonn v. Railroad (Texas), 82 S. W. 808; Winkler v. S. (Texas), 126 S. W. 1134; Dorn v. Cooper (Iowa), 118 N. W. 35; Sneed v. Carrington, 15 Utah, 480; Reese v. Mining Co., 17 Utah, 497; Railroad v. Perkins (Georgia), 51 So. 870; Roehl v. Baasen, 8 Minn. 26; Allen v. Rodgers (N. Y.), 70 Hun. 48; Rucker v. Bolles, 80 Fed. 504; Gutridge v. Missouri Pacific, 94 Mo. 468.

*Henry T. Ferriss* for respondent.

(1) (a) Plaintiff's instruction was not a departure from the petition, nor did it submit the case on the theory of ratification or estoppel. Hoppe v. Saylor, 53 Mo. App. 4; Hackett v. Von Frank, 105 Mo. App. 384; Mitchum v. Dunlop 98 Mo. 418; 2 C. J. 435-444. (b) Even if it did submit the case on theory of ratification or estoppel, it would not be a departure from the petition. 2 C. J. 906, sec. 613; Lipscombe v. Talbott, 243 Mo. 1-28; Fahy v. Grocer Co., 57 Mo. App. 73-77; McLachlin v. Barker, 64 Mo. App. 511-26. (2) Notice to Diesing on August 10, 1914, was notice to the defendant—even though he was not formally appointed president until a few days later—and his failure to object at that time or later was competent evidence of an actual agency. 10 Cyc, 1055; Chouteau v. Allen, 70 Mo. 340-1; First National Bank v. Fricke, 75 Mo. 178; Quinn v. American Bankers Assn., 183 Mo. App. 8. (3) The authority of Yoder & Co. to receive certified checks was expressly set forth in the specifications and the evidence shows that the president of defendant company knew that checks were being received. (4) (a) The testimony of Vogel was competent upon the issue whether Yoder & Co. were actually acting as architects for this defendant. (b) The newspaper article was properly received in evidence as an admission by defendant. Jones on Evidence, sec. 270; Edwards v. City, 13 N. Y. Sup. 309. (c) Newsome's testimony as to Diesing's "knowledge" of certain things was in every instance predicated upon facts which Newsome stated and which removed the case from the domain of opinion testimony

REYNOLDS, P. J.—This is an action by the plaintiff, a corporation, to recover from the defendant, a corporation, the sum of $640, with interest and costs.

It is alleged in the petition that the defendant company was promoted and organized for the purpose of erecting, owning and operating a certain market house on a lot which it acquired on Laclede Avenue, west of Vandeventer Avenue, in the city of St. Louis; that one Newsome and one Yoder, co-partners, doing business under the name of C. B. Yoder & Company, "were authorized by the defendant to act, and they did act, as defendant's architects and agents in preparing plans and specifications for said market house and in soliciting and receiving bids from various contractors and materialmen for the labor and materials necessary in the construction of said building. That the specifications prepared by C. B. Yoder & Company, as architects for said building, provided that all bids for work therein must be accompanied by a certified check of 5 per cent. of the amount of the bid, such checks to be made payable to C. B. Yoder & Company, and to be forfeited in case the successful bidder failed to enter into a satisfactory contract with the owner, i. e., the defendant company, but to be returned if such contract was entered into or if the bid was not accepted. That on or about the 14th day of August, 1914, the plaintiff submitted to said C. B. Yoder & Company, architects for defendant as aforesaid, a bid in writing proposing to furnish and deliver to the defendant for its said market house and to install therein certain electric machinery for a total sum of $12,800, and plaintiffs, further, in accordance with said architects' specifications, deposited with them a certified check for 5 per cent. of the amount of its bid; . . . that said check was deposited with them (C. B. Yoder & Company) upon the understanding that it was to be held by them as a guarantee that plaintiff would enter into a satisfactory contract with the owner, the defendant herein, in case the plaintiff's bid was accepted and that it was to be returned to the plaintiff if its bid was not accepted or, if plaintiff's bid was accepted, when plaintiff should sign a contract with the owner; and further upon the understanding

that the bids were to be opened and the contract awarded within a week or ten days from said date. That said check was received upon the above terms by said C. B. Yoder & Company, as architects and agents for the defendant, and within the scope of their duties as such, and it thereupon became their duty to hold and to return said check in accordance with said terms and not to cash or deposit said check unless, under the terms of the specifications, it became subject to forfeiture by reason of plaintiff's default."

It is further averred that plaintiff's bid was not accepted by the architects or the defendant within the time specified or at any time and that no contract was ever awarded plaintiff by them, whereby, it is averred, plaintiff became entitled to the return of the check. That plaintiff frequently demanded it or its value of the architects and of the defendant, but the demand had been refused. It is further charged that in point of fact the architects wrongfully converted the check by indorsing and cashing it and using the proceeds thereof ($640) in violation of their agreement and duty in the premises, to plaintiff's damage in the sum of $640, for which with interest it prays judgment.

The answer was a general denial.

On a trial before the court and jury there was a verdict in favor of plaintiff, judgment following, from which defendant has duly appealed.

It appears from the evidence in the case that one Minnie Diesing and her brother Edward Krug were owners of 198 feet of ground on the north side of Laclede Avenue and 150 feet west of Vandeventer Avenue, in the city of St. Louis. Minnie Diesing was the wife of Victor Diesing. Along in May, 1914, one Benefield obtained an option upon this real estate, Victor Diesing acting in the matter in behalf of his wife and brother-in-law. Benefield employed C. B. Yoder & Company, architects and engineers, to prepare plans and specifications for a market house, which Benefield proposed to build upon the lots secured by this option. Yoder & Company proceeded to prepare

plans and specifications and had them practically completed by about June 1, 1914. The plans were drawn on fourteen pages of Blue Print, upon each sheet of which was stamped,

"Market House
for
Merchants & Consumers Market House Ass'n,
Vandeventer and Laclede Ave.
C. B. Yoder & Co.
Architects and Consulting
Engineers.
2043-44 Ry. ·Exchange Building,
St. Louis, Mo.

| Sheet | Drawn by W. A. S. | Order No. |
| No. 1 | Traced by W. A. S. | 1004." |
|  | Checked by |  |

The specifications consisted of seventeen pages of typewritten matter bound together and labelled,
"Specifications of Market House for
Merchants & Consumers Market House Association·
North Side of Laclede Ave., 150 Feet West of
Vandeventer Ave.
St. Louis, Mo.
C. B. Yoder & Company,
Architects & Consulting Engineers,
2043-44 Railway Exchange Bldg.
St. Louis, Missouri."

These specifications were preceded with this matter:
"Specifications of material and labor necessary and required in the erection of a market house for the Merchants & Consumers Market House· Association, to be erected on the north side of Laclede Avenue, one hundred and fifty (150) feet west of Vandeventer.

"Plans and specifications prepared by C. B. Yoder & Company, architects and consulting engineers, 2043-44 Railway Exchange Building, St. Louis, Missouri. All bids must be accompanied by a certified check of 5 per cent. of the amount of bid, checks to

made payable to C. B. Yoder & Company, and will be forfeited to them in case bidder fails to enter into a satisfactory contract; otherwise to be returned when contract is entered into, and proper bond put up. The successful bidder will be required to give bond for at least 50 per cent. of the total contract.''

Benefield, apparently, had given up his option before these plans and specifications had been completed and before anything had been done towards promoting the enterprise, and Yoder & Company themselves appear to have undertaken to promote the construction of the market house. They procured one Sanders to secure another option on the property from Diesing. It was while this option was in force that the plans and specifications for the proposed market house were drawn up by Yoder & Company. About August 3, 1914, Diesing, who in the meantime had acquired title to the ground on Laclede Avenue from his wife and her brother, entered into a contract with Newsome, of the firm of Yoder & Company, under which he gave Newsome an option on the property at the price and sum of $20,000, to be paid by Newsome to Diesing, less $100, which had been paid. It was further set out and provided in this option contract between Diesing and Newsome that they were desirous of forming a corporation under the laws of the State of Missouri and of conveying to the corporation the real estate described in the contract, being the 198 feet on Laclede Avenue, before referred to, and it was contracted between them that Newsome should surrender to Diesing the option contract above described; that Diesing, until the organization of the corporation, should hold title to the real estate as trustee for the corporation to be formed, discharged of the option contract, and upon the organization of the corporation Diesing would convey to it, on the terms in the option contract set out, the real estate therein described; that upon the surrender of the option contract Diesing would form, or cause to be formed, a corporation under the laws of the State of Missouri

relating to manufacturing and business corporations, under the name of Merchants & Consumers Market House Association, having an authorized capital of $125,000, divided into 1250 shares of the par value of $100 each, of which 650 shares, it was provided, should be recited to have been fully paid by the conveyance of the real estate to the corporation, the corporation to have a board of five directors and the articles of association to recite the purposes of the organization, which in the main and briefly, may be said to be to erect and construct a market house and equip, furnish and operate it, leasing spaces in it, and to operate and control it as a market house and engage in general commission business for the sale of meats, food stuffs, provisions and similar commodities. It is further provided that within fifteen days after notification by Diesing that a certificate of incorporation had been granted, Newsome would pay to Diesing the sum of $19,900, and that thereupon Diesing would assign and deliver to Newsome such amount of the capital stock of the corporation as might be necessary for the use of the party of the second part, not exceeding $25,000, and that the remainder of this stock, not less than $40,000, which had been subscribed and fully paid, should be assigned and delivered to parties in the following proportion: 29 per cent. to Newsome, 29 per cent. to Diesing, 30 1/2 per cent. to Benefield, and 11½ per cent to Yoder, and that thereupon Diesing would procure the resignation of at least four of the members of the board of directors named in the articles of association other than Diesing and that the vacancies thus created should be filled at a special election of the stockholders called for that purpose, Diesing to advance all necessary money for payment of notary fees, corporation fees, etc., for which he should be reimbursed by the corporation when incorporated.

In the meantime as also thereafter Yoder & Company solicited and were taking bids for the proposed market house. The representatives of the plaintiff, hear-

ing of this, on or about August 10th or 11th, 1914, went to the office of the architects to inquire into the matter and to quote a price. According to the testimony of Mr. Dillon who was the manager of the machinery department of plaintiff, and of Mr. Balke, a salesman, who accompanied Mr. Dillon to the office of Yoder & Company, they met Mr. Newsome and asked him whether they were really in the market and proposed to go on with the enterprise. They were informed by Mr. Newsome that he was ready for business "right now;" that the Market House Association had been formed and had the money and proposed to immediately let contracts and go on with the work, and if plaintiff wanted to get in on the proposition they would have to get in their proposal right away. According to the testimony of Mr. Dillon and Mr. Balke, Mr. Yoder was present; seated across from him at a flat-top desk was a gentleman whom they indentified as Mr. Diesing, and Mr. Newsome was there, standing up and carrying on the conversation. Both Mr. Dillon and Mr. Balke were very positive in their indentification of Mr. Diesing as having been present at that conversation about the 10th or 11th of August. The plans and specifications for the proposed market house were there, spread upon the table before the parties present, and that part of them relating to the basement, in which the articles on which plaintiff was bidding were to be located, was examined. Afterwards, on August 12, 1914, submitting its bid, plaintiff also delivered to Yoder & Company, apparently to Newsome of that firm, a certified check for $640, covering 5 per cent. of its bid, as called for in the specifications, the check payable to the order of Yoder & Company, who, in writing, acknowledged the receipt of it. Some days before this, that is to say under date of August 4, 1914, articles of association were drawn up under the general statutes of this State pertaining to manufacturing and business associations, and duly signed and acknowledged. In these articles the

name of the proposed corporation was given as Merchants & Consumers Market House Association; its capital stock placed at $125,000, divided into 1250 shares of the par value of $100 each, and it is stated that 650 shares thereof had been *bona-fide* subscribed and actually paid in full in real estate, which was in the custody of the persons named in the first board of directors, the real estate being described and stated to be of the actual cash value of $65,000. The names and places of residence of the share holders and the number of shares subscribed by each were stated as follows: Victor Diesing, 646 shares, Minnie Diesing, August Theorner, Joseph F. Lager, Ghio Natoli, 1 share each. These persons signed and acknowledged, the articles and were named as the five shareholders who should constitute the first board of directors; the object and purpose of the corporation was stated to be, to erect and construct a market house, etc., all as set out in the contract heretofore referred to between Diesing and Newsome. These articles were filed with the recorder of the city of St. Louis on August 5th, and a certificate of incorporation issued out of the office of the Secretary of State on August 6, 1914. The incorporators and directors, other than Diesing, were his wife, his clerk, and two friends of Diesing. It appears that the first meeting of the board of directors of the new corporation was held August 25, 1914, all the persons named as the first board of directors being present except Lager, whose consent, in writing, to the holding of the meeting was presented and filed. At that meeting Victor Diesing was elected president, Theorner, secretary, and it is recited in the minutes of the meeting that the attention of the board had been called to the fact that the 198 feet of real estate on Laclede Avenue, and stated to be of the actual value of $65,000, had been turned over to the persons constituting the board of directors in payment for $65,000 of the capital stock of the company,

and the president and secretary were authorized and directed to issue certificates of stock in that amount in exchange for the real estate so conveyed.

Early in August, 1914, and after the articles of association had been filed in the Recorder's office, a reporter for one of the daily city papers called Mr. Diesing up and asked him about the proposed market house. Diesing told the reporter that he was not then ready to discuss the matter with him but to call him up later, which the reporter did. Mr. Diesing then said he was not yet ready, telling the reporter that when they were ready to discuss the matter for publication he would call him up. This he did on September 12, 1914, when the reporter called on him and Diesing went over the matter of the proposed market house and the plan of conducting business in it; told the reporter that they were going to erect it both for a market place and for stores and offices; told him its location and that they were going to begin the following Monday. This interview took place on Saturday and Diesing referred the reporter to Yoder & Company for the details and plans of the building as they had drawn them up. The reporter went to Yoder & Company, getting the information, and on the following day (Sunday) printed an article in his paper to the effect that a new business block was to be erected by the Merchants & Consumers Market House Association on Laclede Avenue west of Vandeventer and that the work was to begin on Tuesday on the site. Diesing had also said, in the presence of a witness, that he intended getting publicity for their project, as it appears that Diesing and Newsome, and possibly others, were negotiating with several parties in St. Louis to underwrite bonds that were proposed to be issued by the company, the proceeds to be used in the erection of the proposed building. For that reason, Diesing said, all the parties in interest desired publicity to be given the enterprise. It further appeared that by a contract of date September 12, 1914, signed by Victor Diesing indi-

vidually, by Merchants and Consumers Market Association, by Victor Diesing, president, as parties of the first part, and by Newsome, as party of the second part, that Diesing and the corporation granted to Newsome the right to begin and continue until the 12th of October, 1914, the excavation required in the erection of the market house proposed to be erected on the property of the parties of the first part, describing it, "said excavation to be made in accordance with the plans and specifications hereto attached and made a part hereof." By this agreement Newsome agreed to pay the costs of the excavating and it was set out that it was not to be understood that the contract gave to the party of the second part any right to the property except as in the contract set out and that nothing in it was to prevent Newsome from being reimbursed by the Merchants & Consumers Market House Association for his expense in connection with making the excavation, Newsome agreeing to furnish a bond in the sum of $6000 to secure the parties of the first part in the performance by him of the terms of the contract. This excavation was accordingly entered into under the direction of a Mr. Lucas, an employee of Yoder & Company. He was engaged in superintending this excavating for something over a month and it appears to have been commenced about September 12th or 13th, the time of the publication of the article in the public press, which is before referred to. Mr. Lucas testified that he had a little house on a lot adjoining the property on which he was working; that he had in there the plans and specifications and that Mr. Diesing was there during the whole time that the excavating was going on, almost daily, very frequently, and that the plans and specifications referred to were lying there easily to be seen and accessible to anyone interested.

This is a brief resume of the somewhat involved and complicated facts developed at the trial of this case, but sufficient we think, to understand the points here involved.

The court, at the instance of the plaintiff, instructed the jury as follows:

"If you find from the evidence that on or about August 12, 1914, the firm of C. B. Yoder & Company were acting as architects and agents of the defendant for the erection of a certain market house of the defendant on Laclede Avenue in this city and were receiving bids for work thereon and certified checks in accordance with the plans and specifications offered in evidence; and that the defendant knew they were thus acting as its architects and agents and receiving bids and checks and permitted them to do so without objection or notice to others; and that while thus acting as defendant's architects and with the defendant's knowledge, said C. B. Yoder & Company received from plaintiff a certain bid for electrical machinery for the defendant's said market house and also a certified check in the sum of $640, representing five per cent. of the amount of plaintiff's bid, to be held by said C. B. Yoder & Company as defendant's architects and agents as a deposit and guarantee that plaintiff would enter into a contract with the defendant if its bid was accepted, but to be returned if its bids was not accepted or if it entered into such contract, and that plaintiff's bid was not accepted and no contract was awarded it, but said C. B. Yoder & Company wrongfully cashed said check and has failed and refused to return same or its proceeds to plaintiff, then you will find in favor of the plaintiff."

This was the only instruction given except as to the measure of damage and the number of jurors necessary to concur. Defendant asked no instructions except one tantamount to a demurrer to the evidence and that was refused.

That Yoder & Company, as architects, had solicited and obtained a number of bids for the furnishing, equipment and construction of the proposed market house is not disputed, nor is it disputed that following the specifications they had exacted and had received from all

the bidders, certified checks, as provided, representing 5 per cent. of the amount of the bid. Nor is it controverted that Newsome, by arrangement with Yoder & Company, on the receipt of these checks, had deposited them, apparently to the credit of himself, and while none of the bids had been accepted and contracts let, the check here involved was not returned to the plaintiff, nor the amount represented by it refunded, nor any contract closed with it.

The first question of importance in the case, as we look at it, is whether Diesing had knowledge of the fact of these checks being exacted and received by Yoder & Company, or by Newsome.

It is true that Diesing denied any knowledge of the matter, but there is substantial evidence in the case sufficient to submit that matter to the jury and to warrant the finding that Diesing was aware of these facts; that is to say, of the exaction of the checks and of their being received and subsequently deposited by Yoder & Company or by Newsome. The testimony of Newsome was taken by deposition and he was asked to state whether, during August and September, 1914, and after Diesing had signed up the contract before referred to between himself and Newsome, Diesing knew that he (Newsome) was getting these bids from various contractors for material. The witness answered, "Yes;" that he was aware that "we were getting bids and had got bids. Yes, sir." This question was asked and the answer made without objection. Newsome was further asked, referring to the contract between himself and his firm, to state what that was, the contract, it appears, having been lost. Newsome testified that he had a contract between himself and his firm, the essence of which was that the certified checks which were exacted from the bidders, were being turned over to C. B. Yoder & Company and that C. B. Yoder & Company gave him (Newsome) permission to use these funds. Newsome further testified that he showed all of these contracts to Diesing. How much attention he paid to them, witness said, he did not know; that

he showed him what he had in hand, all that he was doing and everything, during the course of negotiations. He was asked whether at that time and during the subsequent course of negotiations he could state whether or not Mr. Diesing knew that Yoder & Company were getting these checks, either from conversations or any other way. The witness answered that Diesing knew those checks had been used to a certain extent from the simple fact that he (Newsome) talked with him one day in regard to returning those checks. Counsel for the defendant objected and asked to have this answer stricken out as to the certified checks being returned "because the time is fixed, if it is fixed at all, long after these checks were received; in other words, after the thing had blown up and every one knew that he (Newsome) had taken the money," and that this answer as to Diesing having been told by Newsome about the checks being returned should "be stricken out . . . because the time isn't fixed; I object to those two (answers) and ask that they be stricken out because the time isn't fixed." The court thereupon directed the next question and answer to be read, when he would rule on the objection. Counsel, reading the deposition, then read the following: "Can you fix the time? A. I can't fix the time. It was after I moved my office into the Wright Building; as to the date, I don't know. . . ." The court then asked to see the deposition and looking at it handed it back and over-ruled the objection "because of the fact that what follows brings that (the date referred to) to light." This was objected to. It will be noted, therefore, that the only objection that was interposed to this testimony as to the knowledge of Diesing was for failure to fix the time when it occurred, the court holding, and as we think properly, that the subsequent portion of the deposition fixed the time.

It is also true that in answering a question the witness (Newsome) was permitted to answer that he "knew" that Diesing knew about the exaction of these checks and the use that was made of them. That was

objected to as a mere conclusion. If that answer stood alone, this assignment of error might be well taken, but its admission, in the light of the explanatory testimony of this witness, showing fully the facts on which the conclusion was predicated, rendered it harmless. We say this for the reason that it fully appears from Newsome's testimony that Diesing had full knowledge of the plans, of the requirement that checks accompany all bids, and of the fact that Yoder & Company had so received these checks. There is evidence that Diesing discussed with Newsome the matter of the receipt of those checks and whether or not they should be returned to the bidders. It is argued that this was after the checks had been used by Newsome, and such is the tenor of Diesing's testimony; but Newsome's testimony makes it appear that this occurred while the checks remained in his possession and before he had used them.

The next proposition of importance is, whether this corporation defendant is liable and chargeable with the acts and knowledge of Diesing and with the acts of Yoder & Company, or Newsome. The corporation, not having been formed until August 6, 1914, and Diesing not having been elected an officer—president— until August 25th, it is argued that it cannot be held for these acts. A consideration of all the testimony in the case leads us inevitably to the conclusion that Diesing and Newsome, the latter representing both himself and his firm, were in point of fact the promoters of this defendant organization: were the corporation. Diesing, owning practically all of the stock and being under contract with Newsome to transfer a large part of other shares to him and to others and to put them in charge of the corporation, in our opinion, constitutes such acts as charge the defendant corporation with responsibility for the acts of Diesing and Newsome in connection with this matter. The knowledge of Diesing was that of the defendant. As averred in the petition, Yoder & Company were the agents and representatives in this matter of those who really

constituted the corporation, and that so effectually as to make the corporation, as such, liable for their acts. So, in effect, the instruction given at the instance of plaintiff told the jury. We see no error in this instruction. We think it was warranted by the evidence in the case and based upon a proper theory as governing the law.

It is said by learned counsel for appellant that the petition charged an actual agency existing between Yoder & Company and the defendant, but that not only was there no evidence of this but the evidence completely disproved the allegation. We cannot agree to this latter proposition. There was ample evidence warranting the jury in finding not only an actual agency but in point of fact a participation as one of the promoters by Yoder & Company in the transaction.

It is further argued that the case was submitted to the jury on the theory that the defendant had ratified the unauthorized acts of Yoder & Company and was estopped to deny that agency and that this was a departure from the theory of the case defined in the petition. We do not understand the instruction to do anything of the kind.

It is also said that Yoder & Company, being architects, even if architects for the defendant, which is denied, that fact alone would not have made defendant liable, if they exacted and converted checks from holders, 6 Cyc. 29, 30, being cited for this. That proposition is correct, but there is substantial evidence in this case to show that Yoder & Company were acting for the defendant corporation, or its real owner Diesing, in such a manner as to bind the corporation.

In the course of the trial the testimony of a witness representing another bidder was introduced as to what had taken place between himself and Yoder & Company in connection with these bids. We see no error in the admission of this testimony.

Another objection to testimony made is to the admission of the article published in the city news-

paper and above referred to. We hold that this evidence was properly admitted.

The final assignment of error is that Newsome was permitted to testify that Diesing "knew"' Yoder & Company were using the plans and specifications labelled "Merchants & Consumers Market House Association," and that Diesing "knew" that Yoder & Company were getting in bids and that they were accompanied by checks. We have noticed this point before and repeat what we there said, to the effect that while it was improper to admit this evidence, its admission was not reversible error when we consider in connection with it the testimony which the same witness gave, much of it without objection, covering the same ground and showing how and why Diesing "knew" and had knowledge of these transactions.

There are a few other points made by way of assignment of error which we do not think necessary to notice.

On consideration of the case we have arrived at the conclusion that the verdict and judgment were for the right party. Finding no substantial error in the conduct of the trial, the judgment of the circuit court should be and is affirmed. *Allen* and *Becker, JJ.,* concur.